# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | **Case No. 3:21-cr-00068** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| DARRYL ALDERSON | ) | |

## MEMORANDUM

Before the court is the "Motion of Defendant Darryl Alderson to Suppress the Fruits of the Successive Searches of 1212 Laurel Street, Apartment 1507, Nashville, Tennessee, on May 20, 2020, Both Triggered by a Prior Unreasonable Suspicionless Traffic Stop Conducted on April 17, 2020." (Doc. No. 43.) The United States (hereafter, "Government") has filed a Response in opposition to the motion (Doc. No. 48), and the defendant filed a Reply (Doc. No. 54). The court held an evidentiary hearing on August 2, 2022, at which two officers with the Metropolitan Nashville Police Department ("MNPD") and the defendant testified. In light of all of the evidence in the record and the governing law, as set forth herein, the defendant's motion will be granted in part and denied in part. Specifically, it will denied as to the firearm found on the defendant's person when he was arrested on May 20, 2020 but granted in all other respects.

## I.    PROCEDURAL BACKGROUND

### A.    The Criminal Complaint

A federal Criminal Complaint initiating this prosecution was filed on May 1, 2020 by Ryan Singleton, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATF"), alleging that defendant Alderson had committed violations of 18 U.S.C. § 922(g)(1) (possession of a firearm by a previously convicted felon), 21 U.S.C. § 841(a)(1) (possession with

intent to distribute a Schedule II controlled substance), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime). (Doc. No. 3, at 1.)

Agent Ryan submitted a sworn Statement in Support of Criminal Complaint, providing the factual background for the case. Ryan alleged that the defendant had been pulled over by MNPD Officer Willie Reaves on April 17, 2020 for a window tint violation and that a firearm had subsequently been found during a consensual search of the vehicle. (*Id.* at 2–3.) Alderson was detained at that point and allegedly claimed ownership of the firearm. A search of his person incident to the arrest turned up a bag containing controlled substances, including marijuana and a white powdery substance that field-tested positive for cocaine (and was apparently later determined to contain fentanyl). Ryan states that a review of Alderson's criminal history confirms prior felony convictions for sale of controlled substances and possession of controlled substances with intent to distribute. The charges enumerated in the federal Criminal Complaint are premised upon these allegations.

## B. Original and Superseding Indictments

The original Indictment, issued over a year later on May 3, 2021, contains six counts. (Doc. No. 23.) The first three mirror those set forth in the Criminal Complaint relating to the April 17, 2020 traffic stop: possession with intent to distribute a mixture containing fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) (Count I); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count II); and being a previously convicted felon in possession of a firearm, specifically a Glock GMBH, model 27, .40 caliber pistol, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count III).

In addition, the Indictment further charges crimes premised upon evidence uncovered in the course of the execution of two arrest warrants and two separate search warrants on May 20, 2020, to wit: being a previously convicted felon in possession of two firearms, a Glock GMBH,

model 43X, 9mm caliber pistol and a Glock GMBH, model 26, 9mm caliber pistol, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count IV); knowing possession with intent to distribute more than 500 grams of a substance containing cocaine and hydrocodone, Schedule II controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Count V); and knowing possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count VI).

A Superseding Indictment was returned on September 27, 2021, which varies from the first only insofar as Count IV now charges possession with intent to distribute 400 grams or more of a mixture containing fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1);[1] Count V charges possession of a firearm in furtherance of a drug trafficking crime (previously Count VI); and Count VI charges possession by a previously convicted felon of the same two Glock handguns identified in Count IV of the original Indictment. (Doc. No. 31.)

### C.    The Motion to Suppress and the Parties' Arguments

The defendant filed his Motion to Suppress on April 21, 2022. In the Memorandum in support thereof, he argues that the warrantless search of his vehicle on April 17, 2020 violated his rights under the Fourth Amendment and that the firearm and drugs found after he was pulled over must be suppressed, because (1) Officer Reaves unnecessarily and unlawfully extended the duration and scope of the traffic stop by refusing to release Alderson after concluding that he was not going to charge or arrest him for the traffic violation; and (2) the police lacked probable cause to search Alderson's vehicle for incriminating evidence without a warrant.

The defendant further argues that the weapon found on him when he was arrested, as well as the evidence found during the execution of two separate search warrants at his residence on

---

[1] This modified charge carries a mandatory minimum sentence of twenty-five years, which none of the charges in the original Indictment carried.

May 20, 2020, should be suppressed. First, he argues that the basis for the arrest and the search warrants was the evidence discovered during the illegal April 17, 2020 traffic stop and, therefore, that all of the evidence seized on May 20, 2020 must be suppressed under the "fruit of the poisonous tree" doctrine. (Doc. No. 44, at 13.) In addition, however, the defendant argues that the first warrant obtained for the search of the defendant's residence by MNPD Detective Bradley Hambrick (to which the defendant refers as the "document search warrant" and to which the court will refer as the "Ammunition Warrant"), was nothing but a subterfuge for a drug search and that the Government knew there was not a sufficient nexus between the defendant's residence and his suspected engagement in drug dealing to obtain a search warrant on that basis. The defendant argues that, on its face, the Ammunition Warrant does not provide a sufficient "nexus" between the place to be searched and possible criminal behavior. He then argues that, because the search conducted pursuant to the Ammunition Warrant was unconstitutional, the search conducted pursuant to the second Warrant (the "Narcotics Warrant"), which was premised entirely on evidence found during the execution of the Ammunition Warrant, must also be suppressed as the "fruit of the poisonous tree."

The Government counters, in its Response, that the traffic stop was legal from its inception and did not extend beyond what was reasonably necessary to accomplish the purposes of the traffic stop and, further, that once the defendant stepped out of his car, the "unusual bulge" in his pants "immediately" gave Reaves "reasonable suspicion that criminal activity was afoot." (Doc. No. 48, at 8.) The Government also asserts that the defendant validly gave consent to the search of his vehicle, during which the firearm and unlawful controlled substances were discovered. The Government further contends that the Ammunition Warrant obtained by Detective Hambrick was

supported by probable cause and properly obtained, as a result of which neither search of the defendant's residence was unconstitutional.

In his Reply (Doc. No. 54), the defendant reiterates his argument that police impermissibly extended both the duration and scope of the traffic stop the moment they asked Alderson to exit his vehicle, at which point the stop became an unconstitutional seizure. He also points out that the Government does not actually argue that Officer Reaves had reasonable suspicion to extend the stop once he had returned Alderson's documents to him. Instead, it points to the bulge in Alderson's pants that was only discovered after he was asked to get out of his car. The defendant further contends that the purported consent to the warrantless search of the car was not given freely and voluntarily and that both search warrants derived solely from the police officers' unlawful conduct.

## II.    THE TRAFFIC STOP

### A.    Legal Standard

The defendant's motion, first, seeks to exclude on Fourth Amendment grounds all evidence that law enforcement officers obtained in a search that took place during the course of the traffic stop that took place on April 17, 2020. "Stopping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (internal quotation marks and citation omitted). The Fourth Amendment, of course, does not prohibit all seizures—only unreasonable ones. In the Sixth Circuit, an officer is justified in stopping a car based on "mere 'reasonable suspicion' that a felony has occurred or that a misdemeanor is occurring." *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021). That standard requires officers to have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

"Even if the police have reasonable suspicion to make a traffic stop, they do not have unfettered authority to detain a person indefinitely." *United States v. Campbell*, 26 F.4th 860, 881 (11th Cir. 2022). Instead, to be reasonable, a traffic stop "must be limited in both scope and duration." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (quoting *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010)) (alteration and internal quotation marks omitted). "In scope, the investigative methods police officers employ should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time; in duration, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* (internal quotation marks and citation omitted). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

The Supreme Court elaborated on this standard in *Rodriguez v. United States*, 575 U.S. 348 (2015). As the Court stated there, the acceptable duration of police inquiries during a traffic stop is determined by the seizure's "mission," that is, "to address the traffic violation that warranted the stop" and "attend to related safety concerns." *Id.* at 354. A traffic stop may "last no longer than is necessary" to complete this mission. *Id.* The mission is complete, and the officer's authority to detain a person ceases, "when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Id.* The Supreme Court has identified a number of tasks it says are "ordinary inquiries incident to [a traffic] stop," including "checking the driver's license, determining whether there are any outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. Questions on these topics are appropriate to ensure "that

vehicles on the road are operated safely and responsibly." *Id.* Such questions do not "prolong" the stop; instead, they form part of the "mission" of the traffic stop. *Id.* at 354–55.

The Supreme Court has also identified specific tasks that are not related to a stop's purpose. In *Rodriguez*, for example, the Court observed that a dog sniff cannot fairly be characterized as "an ordinary incident of a traffic stop." *Id.* at 356. Instead, a dog sniff is "a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* at 355 (brackets, quotation marks, and citation omitted). In *Arizona v. Johnson*, 555 U.S. 323 (2009), the Court said that questioning unrelated to the traffic stop—for example, questions directed at a passenger's gang affiliation—is not related to the stop's purpose. *Id.* at 332. Related tasks, therefore, are "ordinary inquiries incident to a traffic stop," whereas unrelated tasks are "other measures aimed at detecting criminal activity more generally." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (discussing *Rodriguez*).

This does not mean that officers necessarily violate the Fourth Amendment every time they question drivers (or passengers) on non-traffic-stop-related topics or use a drug dog during a traffic stop. To the contrary, the Supreme Court reaffirmed that police may conduct "unrelated investigations" during an otherwise lawful traffic stop, but only "so long as unrelated inquiries do not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 355 (brackets, quotation marks, and citation omitted). Thus, the "critical question" in assessing whether extraneous inquiry is legal is whether it "prolongs—*i.e.*, adds time to—the stop." *Id.* at 357 (quotation marks omitted).

Importantly, however, "prolonging" includes any extension of time, no matter how minimal. While the Sixth Circuit for a period of time construed Supreme Court precedent as permitting *de minimis* extensions, *see, e.g.*, *United States v. Everett*, 601 F.3d 484, 492–94 (6th Cir. 2010), following *Rodriguez*, that is no longer the case. *United States v. Whitley*, 34 F.4th 522,

529 (6th Cir. 2022). The Sixth Circuit has expressly recognized that "*Rodriguez* clarifies that any extension of a traffic stop absent independent reasonable suspicion is improper. This is a bright-line rule." *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (citing *Rodriguez*, 575 U.S. at 355–57). As the Eleventh Circuit explained in *Campbell*, 970 F.3d at 1352, it does not matter whether a stop is prolonged by eight minutes or twenty-five seconds. An officer must have a reasonable suspicion to suspend processing the traffic violation and engage in activities that prolong the stop at all.

However, a traffic stop may legally be extended "if 'something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Lott*, 954 F.3d at 923 (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). In that event, officers may prolong the stop for long enough to dispel (or confirm) that suspicion. *United States v. Howard*, 815 F. App'x 69, 76–78 (6th Cir. 2020).

The resulting standard, then, is this: "a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." *Campbell*, 970 F.3d at 1355 (citing *Rodriguez*, 575 U.S. at 353–58). In other words, officers violate the Fourth Amendment if they (1) conduct an inquiry that is unrelated to the traffic stop, but instead is aimed at investigating other crimes, (2) that prolongs the stop (3) without reasonable suspicion. *Id.*

### B.    Hearing Testimony

Both Officer Willie Reaves, the MNPD officer who conducted the traffic stop on the defendant, and his supervisor, Sergeant Michael Mendenhall, testified at the hearing, as did the defendant. Officer Reaves, perhaps conveniently, had a vaguer memory of certain important details than did Sergeant Mendenhall, and the court found Sergeant Mendenhall credible. This recitation

of the facts is the court's distillation of what happened, having made the necessary credibility judgments among the three witnesses and resolved any factual disputes.[2]

Officer Reaves has been an MNPD officer for 15 years and, on April 17, 2020, was assigned to the Juvenile Crimes Task Force, which he described as an "aggressive unit" engaged in proactively searching for violent juvenile offenders. On the day in question, he, Mendenhall, and other members of his unit were patrolling the Edgehill Apartments, a public housing project located generally on 11th Avenue South between Edgehill Avenue and Summit Avenue in Nashville.[3]

In the late afternoon while it was still light, Officer Reaves spotted the defendant driving a Porsche automobile[4] in the area with "extremely dark window tint." He began following the vehicle in his unmarked car, activated his blue lights, and pulled the defendant over in front of what turned out to be his sister's residence. Reaves testified that it took the defendant two to three minutes to pull over after he activated his blue lights, but Sergeant Mendenhall stated it took twenty to thirty seconds for the defendant to stop. Given the short distance that the defendant traveled, the court finds Sergeant Mendenhall's estimate much more credible than Officer Reaves's estimate. The court also found the defendant's testimony on this point somewhat credible. He testified that Officer Reaves was following him very closely and that he thought that, if he stopped quickly, the officer would rear-end his vehicle. Also, he did not want to stop on 11th Avenue because cars were parked all along the side, so he would have been required to stop in the middle of the road there.

---

[2] The court did not request additional briefs, and the parties did not request leave to file them. Therefore, a transcript of the hearing has not been ordered. The court relies on its memory and extensive notes in this discussion of the testimony presented at the hearing.

[3] A photograph of an aerial view of the area, with street names marked, was entered into evidence as Government's Exhibit 4 and was used by the witnesses during their testimony.

[4] The defendant testified that he had bought this used vehicle that morning.

Therefore, he went the additional short distance (making his estimated delay in stopping a total of twenty seconds) to turn onto the horseshoe-shaped drive where his sister lived, which is where he was going anyway to visit his child. He thought that, traffic-wise, this was a safer place to stop, and he also stopped there, as he stated, "so that nothing would happen to me." Because the defendant was "slow to stop," in the officers' view, they alerted other officers in the area, and two other cars parked at the end of the horseshoe drive, with spike strips at the ready, in case the driver attempted to flee in the car.

Reaves stopped behind the defendant's car, and Sergeant Mendenhall pulled up behind Reaves. Another one or two police cars also arrived, meaning that there were at least five or six police cars on the scene. After the car he was following had come to a stop, Reaves used his PA system to instruct the driver of the car, Alderson, to roll the windows down. Alderson immediately complied. Reaves then approached the driver's side, and Sergeant Mendenhall approached the passenger's side of the vehicle. Reaves informed the defendant that he had stopped him because he suspected that his window tint was too dark and in violation of the law. He asked the defendant to raise his window part-way so that he could test the tint with his tint card, which he produced from his pocket during his testimony. His examination revealed that the tint was in violation of the law, and he told Alderson that. He then asked him for his license, registration, and insurance information, which Alderson promptly produced.

Reaves took the documents to his car and confirmed that everything was in order. In checking to determine if there were any outstanding warrants for the defendant, he noted that Alderson had a criminal history but no outstanding warrants. Sergeant Mendenhall joined Reaves while he was still at his patrol car and asked what he was going to do. Reaves stated that he was going to have Alderson step out of the car. It is important to note that, at this point, the officers

had seen nothing inside the car in plain view that caused them any alarm or safety concern. Both testified that Alderson acted nervous but was fully cooperative.

Reaves returned to Alderson's vehicle, gave him his documents back, and asked him to step out of the car to talk with him. Alderson complied. At this point, both officers noticed a bulge in Alderson's pants or waistband that they had not noticed when he was seated in the car. Reaves proceeded to ask Alderson if he was on probation or parole, and Alderson responded that he was on five years of probation. Reaves asked him if there was anything illegal in the car or on Alderson, and Alderson responded in the negative. Reaves then asked him if he could search his car, and Alderson gave his consent.[5]

The officers proceeded to search the car and found a loaded Glock pistol under the passenger seat, where Alderson's companion, Toi Hopson, had been sitting. She apparently initially claimed the gun was hers and that she had a gun permit, but she was unable to describe what Mendenhall considered the rather unusual appearance of the gun. Alderson was arrested and placed in handcuffs. The bulge in his pants turned out to be a bag containing marijuana and nine individually wrapped bags of what was thought to be cocaine. The officers claimed that, after receiving *Miranda* warnings, the defendant admitted that the gun was his. The defendant denies knowing that the gun was in the car and denies that he ever admitted that the gun was his.

C.    **Analysis**

Based on *Rodriguez* and subsequent Sixth Circuit caselaw, as discussed above, the validity of the search that unearthed the weapon in Alderson's vehicle and the drugs on his person hinges on the answers to three questions: (1) was the initial stop justified; (2) did police extend the initial

---

[5] Alderson testified that he gave Reaves consent to search the vehicle.

stop beyond the duration (and scope) necessary to complete the mission of the traffic stop; and, if so (3) was the extension justified by reasonable suspicion.

### 1.    The Initial Stop

The answer to the first question is yes. Under Tennessee law, "[i]t is unlawful for any person to operate, upon a public highway, street or road, any motor vehicle in which any window that . . . [h]as a visible light transmittance of less than thirty-five percent (35%)." Tenn. Code Ann. § 55-9-107(a)(1)(A). Having window tint darker than permitted by this provision is a Class C misdemeanor. *Id.* § 55-9-107(d). The law also states that "[i]t is probable cause for a full-time, salaried police officer of this state to detain a motor vehicle being operated on the public roads, streets or highways of this state when the officer has a reasonable belief that the motor vehicle is in violation of subdivision (a)(1), for the purpose of conducting a field comparison test." *Id.* § 55-9-107(c).

Although Alderson made some effort during the hearing to call into question whether the windows of his new Porsche were illegally dark under Tennessee law, he did not present any evidence to the contrary, and the court fully credits Reaves's testimony that he reasonably believed that the tint was too dark. As set forth above, a police officer may stop a car based on reasonable suspicion that a misdemeanor is occurring. *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021). Reaves clearly had the requisite reasonable suspicion that Alderson's window tint was illegal. He was justified in pulling Alderson over for the purpose of confirming or dispelling that suspicion and, if he confirmed his suspicion, to issue a citation for a Class C misdemeanor. The initial stop was legal.

### 2.    Whether Police Extended the Stop Beyond its Original Mission

The court has found that Officer Reaves did not ask Alderson to get out of his car until after Reaves had run his license, registration, and insurance and confirmed that everything was in

order and that there were no outstanding warrants. Reaves had also fully investigated the window tint and determined that it was illegal.

It is obvious from the totality of the circumstances that Reaves's intention in asking Alderson to exit his car was to question him further—on matters entirely unrelated to the purpose of the initial stop—and to obtain Alderson's permission to search the car. This line of inquiry was clearly outside the scope of the original traffic stop. It is also apparent that Reaves's request that Alderson get out of his car and his questioning Alderson about his probationary status and whether he had anything illegal in the car or on his person extended the duration of the traffic stop beyond tolerable limits under *Rodriguez*.

Specifically, before he returned to Alderson's vehicle, Reaves already had all of the information he needed to write Alderson a ticket or a warning. At this point, the "tasks tied to the traffic infraction [were]—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 349. Reaves should have, upon his return to Alderson's car, returned his documents and either issued a citation or warning for the traffic violation or sent him on his way. Instead of doing either of those things, Reaves began investigating possible unrelated criminal activity instead. As set forth above, prolonging a traffic stop for any length of time beyond that necessary to complete the functions associated with the traffic stop itself is no longer permissible unless the officers had reasonable suspicion to justify doing so. *See Campbell*, 26 F.4th at 884 ("[A] stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes.").

To be clear, the Supreme Court has continued to recognize that it is permissible for a police officer, during the course of a traffic stop, to ask a driver to get out of his vehicle, but the legitimacy of that action hinges on the officer's legitimate concern for his own safety. *See Rodriguez*, 575

U.S. at 356 ("On-scene investigation into other crimes . . . detours from [the mission of the stop itself]. *So too do safety precautions taken in order to facilitate such detours*." (emphasis added)). In this case, there is no suggestion that Reaves asked Alderson to get out of the car because Reaves had a safety interest in doing so. The purpose of getting Alderson out of the car was to facilitate an investigation of other possible crimes. *Accord Lott*, 954 F.3d at 924 ("A dog-sniff, safety measures taken to facilitate a different investigation, and unrelated questioning, for example, are not tasks incident to the initial stop. A traffic stop cannot be extended to accommodate such unrelated tasks absent independent reasonable suspicion." (citing *Rodriguez*, 575 U.S. at 355–57)).

In short, the answer to the second question is also yes: Officer Reaves extended the stop beyond its necessary scope and duration by asking Alderson to get out of the car, questioning him about his probationary status and whether he had anything illegal on him, and asking for consent to search the car.

### 3. Whether the Officers Had Reasonable Suspicion to Extend the Stop

The stop became illegal at that point unless Reaves had reasonable suspicion to extend the stop. To establish reasonable suspicion, an officer must demonstrate that he or she has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1986). The Supreme Court has stated that this inquiry has two elements, one objective and one subjective:

> First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions . . . .
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in

wrongdoing. . . . "[T]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Id., 392 U.S., at 21, n. 18,

*Cortez*, 448 U.S. at 418 (quoting *Terry*, 392 U.S. at 21 n. 18).

Although reasonable suspicion is a lower threshold than probable cause, an officer still must act on more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. The reasonable suspicion inquiry "falls considerably short of 51% accuracy," because "[t]o be reasonable is not to be perfect." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quotation marks and citations omitted). Instead, reasonable suspicion involves officers making "commonsense judgments and inferences about human behavior." *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). Although one individual fact that forms the basis of an officer's suspicion may be "perhaps innocent in itself," reasonable suspicion nevertheless exists when all the circumstances "taken together warrant[] further investigation." *Terry*, 392 U.S. at 22. As the Sixth Circuit has reiterated, the evidentiary standard for reasonable suspicion is "not a high bar." *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016).

In this case, Officer Reaves, as the officer who effected the stop and who, according to his supervisor, was in charge of it, never testified that he had, or believed that he had, reasonable suspicion to extend the traffic stop. Instead, he reiterated several times that he asked Alderson to step out of his vehicle so he could calm him down and reassure him and thus make sure that things did not "escalate." When he was recalled to the stand after Alderson testified, Reaves confirmed that it was his understanding of the law that, as a police officer, he had the power to ask a driver to get out of his vehicle "any time" he decided he wanted to. As set forth above, that was no longer the law at the time this traffic stop occurred—and had not been for several years.

The Government claims that the fact that Alderson was "slow to stop" after Reaves activated his lights contributes to reasonable suspicion. The court has already found from the

conflicting testimony that Alderson did not stop for twenty or thirty seconds. This slight delay may or may not have been suspicious. The officers testified that it was and that it meant that the occupants of the car may have been hiding contraband or contemplating fleeing.

The court has located only one other case that discusses this issue as contributing to the reasonable suspicion analysis. In *United States v. Valverde*, No. CR 1:18-10005-STA, 2018 WL 9618060 (W.D. Tenn. Sept. 10, 2018), a dash cam system established that twenty-three seconds elapsed between the time the state trooper turned on his blue lights and the subject vehicle stopped. *Id.* at *1. The state trooper testified that this was an unusually long delay in his experience and that the normal length of time for someone to pull over was ten to twelve seconds. The court found that "a delay of only a few moments was not enough to raise suspicion of criminal activity, at least not a strong suspicion." *Id.* at *8.

This court agrees. In particular, because the officers here failed to indicate what length of time they believed would have been reasonable and made no effort to rebut Alderson's testimony that stopping on 11th Avenue would have required him to stop in the middle of the road, the delay here was not enough, standing alone, to raise a suspicion of criminal activity.[6]

The Government also points to Alderson's nervousness during the stop as contributing to reasonable suspicion. The Sixth Circuit has recognized that nervousness is, at best, "an unreliable indicator, especially in the context of a traffic stop." *Stepp*, 680 F.3d at 665 (citation omitted). That is because citizens often become nervous when stopped by police, "even when they have nothing to hide." *United States v. Richardson*, 385 F.3d 625, 631 (6th Cir. 2004); *see also Lott*, 954 F.3d at 923 (stating that nervousness alone is "legally insufficient" to establish reasonable suspicion

---

[6] The court also notes that whatever suspicion this factor might have raised before Alderson came to a stop likely dissipated during the traffic stop, as Reaves testified that Alderson was calm and cooperative throughout the encounter.

(citing *United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016)). Because of its inherent unreliability, nervousness is given little weight and "even then only in conjunction with other factors." *United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015) (internal quotation marks and citation omitted).

The final factor to which the Government points is Alderson's criminal history. The weight accorded a defendant's criminal history depends on the circumstances. In *Stepp*, the district court found reasonable suspicion to extend a stop, and the Sixth Circuit affirmed, based in part upon the defendants' criminal history. While discounting many of the other factors the Government identified as contributing to reasonable suspicion (including nervousness), the court noted that the officer conducting the stop received information, during the stop, that the driver had been investigated by the DEA for trafficking cocaine and that the passenger had a prior felony conviction for narcotics. *Stepp*, 680 F.3d at 667. In considering this factor, the court noted that its prior cases considering "the role of criminal history in the reasonable-suspicion calculus, as with other factors, often point in both directions." *Id.* The court noted that it had held both that a prior drug violation contributed to the justification for extending a detention, *id.* (citing *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*)), and that "an officer's knowledge that a defendant has a criminal history is not enough to create reasonable suspicion, even when combined with other weaker indicators such as nervousness and illogical travel plans," *id.* (citing *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003)). In the case before it, the criminal histories available for both the driver and passenger were "specific and related to the same suspicions that the officer was developing—that the occupants of the vehicle might be involved in drug trafficking." *Id.* The court ultimately concluded that, although a detainee's criminal history, standing alone, could not

establish reasonable suspicion, it was "one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior." *Id.* (citations omitted).

In this case, the fact that Alderson had prior drug-related convictions might conceivably have weighed in favor of a finding of reasonable suspicion, particularly when combined with the other, weaker factors of nervousness and a slight delay in pulling over. At the same time, however, the record in this case does not establish what, exactly, Reaves discovered when he searched for outstanding warrants and apparently pulled up Alderson's criminal history. More importantly, Reaves never testified that he had reasonable suspicion based on Alderson's prior criminal history. Mendenhall indicated that criminal history would contribute to reasonable suspicion for him, but Mendenhall never saw Alderson's criminal history prior to the arrest, and Mendenhall did not make the decision to prolong the traffic stop by having Alderson step out of his car.

The Sixth Circuit has stated that a "court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Here, Reaves repeatedly stated that he got Alderson out of his car to "calm him down," reassure him, and not escalate the encounter. He did not state that he got him out of his car because he suspected that he was engaged in drug trafficking, nor did he state the basis for any such suspicion. In fact, he could not recall whether he asked Alderson to get out of his car before or after he had looked up his criminal history. The court, accordingly, cannot find as a factual matter that Reaves subjectively relied on this factor to extend the duration and scope of Alderson's detention.

This leaves only two weak factors on which Reaves might have relied: Alderson's nervousness and his being slow to stop after Reaves activated his blue lights. Notably, Reaves did not actually testify that he relied on these factors to justify getting Alderson out of his car either.

Further, Reaves acknowledged that many people are nervous when they are pulled over by the police, and he failed to establish how much delay there actually was between when Alderson should have stopped and when he actually stopped. These two factors considered in the totality of the circumstances were simply too weak, standing alone, to give rise to the reasonable suspicion necessary to extend the duration and scope of the traffic stop.

One final matter: the fact that Alderson admits that he consented to the search of his car is irrelevant. It was clear, at the time Reaves asked him to step out of his car, that the detention was no longer reasonable and, moreover, that Alderson was not free to leave. First, Alderson testified that he was told that he was not. And second, Alderson had at least two police cars behind him and two in front of him, at the end of the drive. His consent to the search was requested and granted "after the 'Terry clock' had stopped," and Reaves's "act of requesting consent from [Alderson] to conduct the [search] after the '*Terry* clock' had run did not somehow operate to reset the clock." *Valverde*, 2018 WL 9618060, at *10. Alderson's consent "did not justify an extension of an already unreasonable stop." *Id.*

The court finds, in sum, that the extension of the stop for the purpose of investigating whether Alderson was involved in some criminal activity was not supported by reasonable suspicion and, consequently, violated his rights under the Fourth Amendment.

### 4.        *Whether the Fruits of the Traffic Stop Must Be Suppressed*

The question remains whether the evidence uncovered after Alderson was removed from his car must be suppressed. While the Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const. amend. IV, it says nothing about the remedy for violations of that protection and, in particular, nothing about suppressing evidence. *See, e.g.*, *Davis v. United States*, 564 U.S. 229, 236 (2011) ("The Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a prudential doctrine created by

this Court to compel respect for the constitutional guaranty." (internal quotation marks and citations omitted)). "Whether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *United States v. Leon*, 468 U.S. 897, 906 (1984) (internal quotation marks and citation omitted). Exclusion is a "last resort," rather than a "first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The sole purpose of the exclusionary rule is to deter future Fourth Amendment violations. *Herring v. United States*, 555 U.S. 135, 141 (2009). In deciding whether to apply the rule in a given case, the court must consider the extent of such deterrence as well as the social costs of suppressing evidence, and "the benefits of deterrence must outweigh the costs." *Id.*

Turning to the question of deterrence, this inquiry "turns to a large extent on considerations of deliberateness and culpability." *United States v. Chivers*, No. 1:19-CR-119, 2020 WL 5757135, at *14 (S.D. Ohio Sept. 28, 2020). That is, "[t]o trigger the exclusionary rule, police conduct must be sufficiently *deliberate* that exclusion can meaningfully deter it, and sufficiently *culpable* that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144 (emphasis added). The most obvious cost of applying the exclusionary rule is "letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Id.* at 141 (quoting *Leon*, 468 U.S. at 908). However, "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238 (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted). Conversely, when police officers act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, 468 U.S. at 909 (citation omitted), or when their conduct involves "isolated negligence," *Herring*,

555 U.S. at 137, the "deterrence rationale loses much of its force," and exclusion cannot "pay its way." *Leon*, 468 U.S. at 919, 907 n.6 (citations omitted).

The rationale behind *Leon*'s so-called "good-faith exception" to the exclusionary rule is that, when officers act in good faith, then deterrence is not an issue, which counsels against exclusion. Importantly, however, the analysis of deterrence and culpability—and good faith—is *objective. See Herring*, 555 U.S. at 145 ("The pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers." (internal quotation marks omitted)). Thus, the good-faith inquiry "is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal" in light of "all of the circumstances." *Leon*, 468 U.S. at 922 n.23.

Applying those considerations here, the court finds that suppression is warranted. Officer Reaves may well have had a sincere subjective belief that Alderson was likely engaged in criminal activity. But a subjective good-faith belief is not sufficient; the officers must have an objectively reasonable good-faith belief. *See Herring*, 555 U.S. at 145 ("'[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" (quoting *Leon*, 468 U.S. at 922 n. 23)). The key question in assessing objective good faith is "the clarity of the rule" the police officers violated. *Chivers*, 2020 WL 5757135, at *15. *Rodriguez* was decided more than five years before the stop at issue, and it established "both (1) that any non-traffic-stop-related activity that prolongs a traffic stop must be supported by reasonable suspicion, and (2) that there is no *de minimis* exception." *Id.*[7] Consequently, a well trained officer should have known the rule

_____

[7] The Sixth Circuit had also applied and construed *Rodriguez* as establishing those principles prior to Alderson's detention on April 17, 2020. *See, e.g.*, *Lott*, 954 F.3d at 923–24

by the time Alderson was detained. *Accord Chivers*, 2020 WL 5757135, at *15. Reaves, in fact, affirmed his objectively unreasonable misunderstanding of the law when he confirmed his belief that he had the authority to get a driver out of his vehicle at any time during a traffic stop. Under these circumstances, application of the exclusionary rule in this case will serve to "discourag[e] officers from delaying a traffic stop to fish for evidence of criminal activity based on a hunch or a broadly generalized profile." *Id.* (quoting *United States v. Cornejo*, 196 F. Supp. 3d 1137, 1158 (E.D. Cal. 2016)). The interest in deterrence weighs in favor of exclusion in this case and outweighs any social costs incurred in excluding the evidence discovered during the traffic stop.

The defendant's motion to suppress the evidence obtained in the course of the traffic stop that took place on April 17, 2020, therefore, will be granted.

## III. THE ARREST WARRANTS AND SEARCH WARRANTS

### A. Fruit of the Poisonous Tree

The parties did not present any evidence at the hearing regarding the procurement and execution of the two arrest warrants or the search warrants. The evidence before the court, therefore, consists of the documentary evidence in the record. It appears from the record that, based entirely on the firearm and drugs recovered during Alderson's unlawful detention on April 17, 2020, two warrants were issued for his arrest: the federal arrest warrant on the initial charges at issue in this case (*see* Doc. No. 4), and a state arrest warrant for parole violation (*see* Doc. No. 48-1, at 4)). To serve those warrants, federal and state officials apparently worked together to verify Alderson's residence and, in the course of arresting Alderson, found a second firearm on him, which led to the procurement of the Ammunition Warrant. While searching Alderson's residence

---

(decided April 1, 2020, construing *Rodriguez*); *Hernandez*, 949 F.3d at 256 (decided January 30, 2020, characterizing *Rodriguez* as establishing a "bright-line rule").

in the course of executing that warrant, law enforcement officers found additional evidence of drug dealing that led to the procurement of the Narcotics Warrant.

The second part of the defendant's Motion to Suppress seeks the suppression of all of the subsequently discovered evidence and, in particular, the evidence obtained through the execution of the Ammunition Warrant and Narcotics Warrant on May 20, 2020, under the "fruit of the poisonous tree" doctrine. He argues that the initial illegal seizure "corrupts the later successive searches of 1212 Laurel Street" and that the police "used illegally obtained information to secure the subsequent challenged search warrants." (Doc. No. 44, at 9, 13.)

### 1. Legal Standard

The exclusionary rule, discussed above, "is supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)). "As the use of the word 'derived' suggests, the doctrine extends to evidence not directly obtained in an illegal search." *United States v. Elmore*, 18 F.4th 193, 199 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 2666 (2022); *see also Utah v. Strieff*, 579 U.S. 232, 237 (2016) ("[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality[.]'" (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, to exclude evidence under this doctrine, the defendant must show more than "the mere fact that a constitutional violation was a 'but-for' cause of [the police's] obtaining [the] evidence." *Hudson*, 547 U.S. at 592. "[B]ut-for causality is only a necessary, not sufficient condition for suppression." *Id.* "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by

exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *Wong Sun*, 371 U.S. at 487–88 (internal quotation marks omitted)).

In other words, as with the exclusionary rule discussed above, not all evidence that qualifies as "fruit of the poisonous tree" must be suppressed "simply because it would not have come to light but for the illegal actions of the police." *Wong Sun*, 371 U.S. at 487–88. Rather, in light of its "significant costs," the rule is "applicable only . . . where its deterrence benefits outweigh its substantial social costs." *Hudson*, 547 U.S. at 591. Given this limitation, the Supreme Court has "recognized several exceptions" to the exclusionary rule. *Strieff*, 579 U.S. at 238. These exceptions are: (1) the "independent source doctrine"; (2) the "inevitable discovery doctrine"; and (3) "the attenuation doctrine." *Id.*

The first of these doctrines "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Id.* (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)). Alternatively, if evidence would have been discovered even without the unconstitutional source, it is admissible under the inevitable discovery doctrine. *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 443–44 (1984)). The attenuation doctrine permits the admission of evidence "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson*, 547 U.S. at 593).

### 2.     The Federal Arrest Warrant

The defendant does not focus specifically on the fact that a gun was found on him during execution of the federal arrest warrant and that it was that gun that nominally provided the basis for the Ammunition Warrant. He argues more broadly that everything that happened after his initial arrest resulted from the illegal detention and, therefore, must be excluded. The Government,

likewise, does not focus on the defendant's arrest. It is clear, however, that the arrest warrants were premised entirely on Alderson's having been illegally detained and then arrested on state weapon and drug charges on April 17, 2020.[8]

There is no evidence that federal agents had independently acquired information from a separate, unrelated source that would have justified issuance of the arrest warrants or, alternatively, that information supporting the issuance of the arrest warrants would inevitably have been discovered, even without the unconstitutional source of the primary evidence against Alderson. The only potentially relevant exception to the exclusionary rule here is whether attenuation applies.

The test for attenuation is whether the evidence sought to be introduced—the gun found on Alderson when he was arrested on May 20, 2020—"has been come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (internal quotation marks omitted). The Supreme Court has identified three factors to guide this inquiry: "(1) the temporal proximity between unconstitutional conduct and the discovery of the challenged evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Elmore*, 18 F.4th at 200 (citing *Strieff*, 579 U.S. at 2039).

Regarding temporal proximity, the Sixth Circuit has said both that the passage of two months was insufficient to free a confession of the "taint" of an illegal search, *United States v. Baldwin*, 114 F. App'x 675, 683–84 (6th Cir. 2004) (unpublished opinion), and that the passage of two months between the unlawful seizure of a defendant and his "subsequent voluntary

---

[8] The state warrant for probation violation is not in the record, but there is no evidence that it was based on any activity other than the April 17, 2020 arrest and the evidence found then. The federal Criminal Complaint and arrest warrant (Doc. Nos. 3, 4) conclusively show that the federal arrest warrant was premised on the evidence found during the April 17, 2020 traffic stop.

confession . . . weighs significantly toward attenuation." *United States v. Gross*, 662 F.3d 393, 402 (6th Cir. 2011). In this case, the passage of time was approximately one month. The court finds that this length of time does not weigh strongly in favor of the Government.

Moreover, during that month, the only "intervening" events were the issuance of the arrest warrants based on the traffic stop and the surveillance of Alderson's residence—neither of which would have occurred but for the original Fourth Amendment violation. Moreover, the investigatory activity that took place during that time period did not yield additional evidence that Alderson was engaged in criminal activity. On the other hand, the federal arrest warrant was sought by a federal agent who was not involved in Alderson's original arrest and was issued by a neutral federal magistrate, neither of whom had any reason to know that the original arrest was unlawful. These events, however were not divorced from the illegality of the original search, as the entirety of the evidence upon which Agent Singleton relied was derived directly from the illegal traffic stop. This factor, therefore, does not appear to weigh in favor of the Government either.

Regarding the final factor, the Supreme Court has stated that exclusion is favored "when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 579 U.S. at 241. This court has found that the conduct at issue in this case was purposeful and, insofar as it clearly violated well established law of which Officer Reaves should have been aware, it was fairly flagrant.

One other outstanding issue is whether the *Leon* good-faith exception may also apply in the context of the "fruit of the poisonous tree" doctrine. The Sixth Circuit addressed this issue for the first time in *United States v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005). There, two police officers had conducted a warrantless search of a house that turned up evidence "that a marijuana grow operation was being set up in the basement of the house." *Id.* at 560. As a result of that

evidence, a drug task force began an investigation, which ultimately led to the issuance of search warrants for five different houses and the discovery of a large marijuana grow operation. The defendants sought suppression of all of the evidence discovered upon execution of the search warrants as tainted by the initial illegal search.

The first question the court confronted was whether the initial search was, in fact, illegal. The court found that it was. Because it was based on neither probable cause nor exigent circumstances to justify a warrantless search, it violated the Fourth Amendment. The next question was whether that prior illegal search required suppression of the evidence obtained pursuant to the later-issued warrants, which would not have issued but for the evidence obtained during the initial search. In addressing this question, the court noted that, ordinarily, the exclusionary rule would exclude all evidence obtained subsequent to, and as a consequence of, an illegal search because, as the fruit of a prior illegality, such evidence is tainted unless (1) the government learns of the evidence from an independent source; (2) the connection with the unlawful search becomes so attenuated as to dissipate the taint; or (3) the evidence would inevitably have been discovered. *Id.* at 564 (citations omitted). The court, without discussion, found that none of these exceptions applied.

It nonetheless went on to consider whether *Leon* applied to save the subsequently issued warrants: "The question therefore becomes whether the good faith exception to the exclusionary rule can apply in a situation in which the affidavit supporting the search warrant is tainted by evidence obtained in violation of the Fourth Amendment." *Id.* at 565. The court found that this was one of "those unique cases in which the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation." *Id.* Specifically, it found several factors to be relevant: (1) "the officers who sought and executed the search warrants were not the same officers who

performed the initial warrantless search"; (2) the officer who prepared the search warrant affidavit "fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search"; and (3) "the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable." *Id.* at 566. The court noted, in particular, that there was "nothing more" that the officer who procured the search warrants "could have or should have done under these circumstances to be sure his search would be legal." *Id.* (quoting *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985)).

In this case, too, the federal agent who procured the federal arrest warrant (analogous to the search warrants at issue in *McClain*) was not involved in the traffic stop. His Statement in Support of Criminal Complaint, which also supports issuance of the arrest warrant, set forth the background facts as known to him and does not contain any facts that Agent Singleton knew or should have known to be false, and there is no evidence that he was not acting in good faith. Finally, although the court has determined, as set forth above, that the traffic stop violated Alderson's Fourth Amendment rights, it took an evidentiary hearing to reach that conclusion, and the basic facts "surrounding the initial warrantless search were close enough to the line of validity" to make belief in the validity of the federal arrest warrant "objectively reasonable." *Id.*[9]

Under these circumstances and, further, given that the defendant did not actively argue in support of suppression of the federal arrest warrant, the court finds that this is "one of those unique cases in which the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation." *Id.* at 565.

---

[9] To be clear, this finding does not obviate or negate the fact that the evidence used to support the federal Arrest Warrant must be suppressed.

3.      *The Ammunition Warrant*

The face of the Ammunition Warrant reflects that it was executed by Davidson County Criminal Court Judge Mark Fishburn at 3:21 p.m. on May 20, 2020, authorizing a search of the defendant's residence (1212 Laurel Street, Apartment 1507), based on the Affidavit in Support of Search Warrant completed by MNPD Detective Bradley Hambrick and submitted to Judge Fishburn in support of the warrant. Although it also contains a narrative of the events that occurred during the traffic stop, the Affidavit reflects that Alderson was arrested on the outstanding arrest warrants in the parking garage at 1212 Laurel Street and that, during a search incident to the arrests, Alderson was found to be carrying a handgun. (Doc. No. 48-1, at 4–5.) The defendant argues that the Ammunition Warrant is insurmountably "tainted" by the illegality of the traffic stop.

The court, however, finds that *Leon* applies here as well. Again, (1) "the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search," nor the same as the officers who executed the federal arrest warrant; (2) Hambrick, the officer who prepared the Affidavit in support of the Ammunition Warrant, "fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search," as well as the events that occurred when Alderson was arrested on May 20, 2020; and (3) "the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable." *McClain*, 444 F.3d at 566. Even if the evidence in support of the Ammunition Warrant was, to some degree, derived from the traffic stop, it is nonetheless saved by *Leon*.

Moreover, the attenuation exception also comes into play. As already stated, the Ammunition Warrant was premised, not only on the evidence obtained during the traffic stop, but also—and primarily—upon the gun found on Alderson when he was arrested on May 20, 2020. It is clear that, but for the arrest and the weapon found during the search incident to the arrest, the

Ammunition Warrant would not have issued. The validly issued and validly executed federal arrest warrant and the gun found incident to that arrest together constitute a significant intervening event that further breaks the chain between the unlawful traffic stop and the procurement of the Ammunition Warrant.

In sum, the Ammunition Warrant based on the firearm found on Alderson on May 20 was sought in good faith and was sufficiently attenuated from the original unlawful seizure that the evidence seized in reliance on it is not subject to exclusion on the basis of the "fruit of the poisonous tree" doctrine.

### B. Probable Cause

That is not to say, however, that the Ammunition Warrant is not subject to other problems. Alderson also argues that the Ammunition Warrant is defective because it was not supported by probable cause and that the evidence seized during its execution is subject to exclusion on that basis.

The Ammunition Warrant states, in relevant part:

> [p]roof having been made before [Judge Fishburn] by Detective Bradley Hambrick that there is probable cause to believe that certain evidence of a crime, to wit: violations of Tennessee state laws as set forth in . . . T.C.A. 39-17-1307(B) Unlawful carrying or possession of a firearm by a convicted felon[,] will be found on or within 1212 Laurel Street, Apartment 1507[,] and the evidence to be searched for is as follows: Any ammunition or firearm accessories that could be utilized by a Glock, Model: 43X, 9mm, semi-automatic firearm.

(Doc. No. 48-1, at 2.)

The Affidavit in Support of Search Warrant completed by Detective Hambrick and submitted to Judge Fishburn in support of the warrant application likewise states that Hambrick had "probable and reasonable cause to believe that evidence of criminal conduct" would be found within the defendant's residence, identifies the criminal conduct at issue to be violations of Tenn. Code Ann. § 38-17-1307(B) [sic], and specifies that the "evidence to be searched for" to establish

such "violations" was "[a]ny ammunition or firearm accessories that could be utilized by a Glock, Model: 43X, 9mm, semi-automatic firearm." (*Id.* at 4.)

The Statement of Facts in Support of Probable Cause recited the following allegations, made under oath by Detective Hambrick:

- Darryl Alderson has three prior felony convictions: two convictions for possession with intent to distribute cocaine and one of sale of cocaine;

- Alderson was stopped for a traffic violation on April 17, 2020, which ultimately resulted in his arrest for being a previously convicted felon in possession of a handgun, possession of a firearm "with intent," possession of cocaine with intent to distribute, and possession of a controlled substance;

- As a result of his arrest on those state criminal charges, a warrant for his arrest for parole violation was issued on April 20, 2020, and a federal arrest warrant was issued on May 1, 2020 for violations of 18 U.S.C. §§ 922(g) and 924(c) and 21 U.S.C. § 841(a)(1);

- Premised on those outstanding arrest warrants, MNPD detectives located Alderson at a condominium complex located at 1212 Laurel Street, Nashville, Tennessee and verified, through surveillance and other investigative techniques, that Alderson resided at Apartment 1507 within that complex;

- At around 1:00 p.m. on May 20, 2020, Alderson was arrested on the outstanding arrest warrants in the parking garage at 1212 Laurel Street; and

- During a search of his person incident to the arrest, Alderson was found to be carrying a Glock, Model 43X, 9mm handgun, as well as a key fob assigned to Apartment 1507.

(*See* Doc. No. 48-1, at 4–5.)

In the "Experience of Affiant" section of the Affidavit, Detective Hambrick further attested that he has been a sworn MNPD police officer since December 2012 and was assigned to the Specialized Investigation Division, Gang Unit, from April 2017 to December 2018, when he transferred to the Crime Gun Unit. (*Id.* at 5.) He has "participated in writing and serving previous search warrants of various types which have resulted in criminal charges and convictions for criminal offenses, and has participated in investigating numerous property crimes and personal

crimes and has testified numerous times regarding criminal charges" in the Davidson County, Tennessee courts. (*Id.*)

       *1.*    *Legal Standard*

As set forth above, the Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. amend. IV. To secure this right, the Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* "Indeed, the right of a citizen to retreat into the home and 'there be free from unreasonable governmental intrusion' stands at the core of the Fourth Amendment." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Id.* (quoting *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)). A judge presented with a search warrant application is simply required "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Probable cause exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)). "The Fourth Amendment does not require probable cause to believe evidence will *conclusively* establish a fact before permitting a search, but only probable cause . . . to believe that the evidence sought *will aid*

in a particular apprehension or conviction." *Id.* quoting *Messerschmidt v. Millender*, 565 U.S. 552 n.7 (2012)) (internal quotation marks omitted) (emphasis and ellipsis in original).

Critically, to justify a finding that such probable cause exists, the affidavit must establish "a nexus between the place to be searched and the evidence sought." *Brown*, 828 F.3d at 381 (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*)). Regarding the nexus requirement, the Sixth Circuit has explained that

> the connection [*i.e.*, nexus] between the residence [to be searched] and the evidence of criminal activity must be specific and concrete, not vague or generalized. If the affidavit does not present sufficient facts demonstrating why the police officer expects to find evidence in the residence rather than in some other place, a judge may not find probable cause to issue a search warrant. And of course, whether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented.

*Id.* at 382 (citations and internal quotation marks omitted). That is, "the affidavit must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and not merely that the owner of property is suspected of crime." *Peffer*, 880 F.3d at 270 (quoting *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006)) (internal quotation marks omitted).

At the same time, however, "[a] magistrate may infer that the evidence sought is likely to be found in the criminal's residence based on 'the type of crime being investigated, the nature of the things to be seized . . . and the normal inferences that may be drawn as to likely hiding places,' and 'it is reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there.'" *Id.* (quoting *United States v. Williams*, 544 F.3d 683, 686–87 (6th Cir. 2008)). Specifically, in the context of firearms, the Sixth Circuit has acknowledged that, because "'individuals who own guns keep them at their homes,' a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun

that was used and the suspect's residence." *Id.* at 271 (quoting *United States v. Smith*, 182 F.3d 473, 480 (6th Cir. 1999)).

Thus, for instance, the Sixth Circuit has upheld the reasonableness of a search warrant for the defendant's residence that was based on "nothing more than [an] informant's statement" that he had seen the defendant "in possession of a silencer at a clubhouse," coupled with the affiant's stated awareness, "based on his training and experience, 'that firearms, ammunition, and related items are commonly stored within the owner or possessor's dwelling.'" *Id.* (quoting *United States v. Vanderweele*, 545 F. App'x 465, 469 (6th Cir. 2013)); *see also United States v. Goodwin*, 552 F. App'x 541, 546 (6th Cir. 2014) (upholding a warrant to search illegal-gun purchaser's residence where an affidavit established that the gun sought was valuable and that "owners usually keep machine guns in their homes"); *United States v. Cobb*, 397 F. App'x 128, 133 (6th Cir. 2010) (upholding a warrant to search a bank robber's residence for the clothing and gun he had used during a robbery because the "reasonable inference is that this clothing and gun likely would have been in [defendant's] possession six weeks following the final robbery").

When a judge makes a probable cause determination, he only needs to "make a practical, common-sense decision," given the totality of the facts. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When assessing the validity of a challenged search warrant, the reviewing court must give "great deference" to the issuing judge's determination, while ensuring that he "had a substantial basis for concluding that probable cause existed." *Id.* at 236, 238–39 (alterations omitted). The court's review of the "sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *Brown*, 828 F.3d at 381 (quoting *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)).

In addition, however, as also already discussed, even when a warrant is determined to be defective and an ensuing search to violate the Fourth Amendment, that does not mean that the evidence seized must necessarily be suppressed. In *United States v. Leon*, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. at 905. This rule constituted a "break from the previously reflexive and uncompromising approach of excluding all evidence seized without probable cause." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). Following *Leon*, a district court presented with a motion to suppress claiming a lack of probable cause must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) (quoting *Leon*, 468 U.S. at 923 n.23). "Only when the answer is 'yes' is suppression appropriate." *White*, 874 F.3d at 496. Generally, however, the courts are to accord "great deference" to a magistrate judge's finding of probable cause and decision to issue a warrant. *Leon*, 468 U.S. at 914.

To assist courts in resolving whether the good-faith exception applies, *Leon* outlined four circumstances in which an officer's reliance on a search warrant would be objectively unreasonable and the evidence procured by it should, therefore, be excluded: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role" and served "merely as a rubber stamp for the police"; (3) where the affidavit does not "provide the magistrate with a substantial basis for determining the existence of probable cause"—that is, where the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable"; and (4) where the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 914–15, 923 (quotation marks and citations omitted).

        2.    *Whether the Ammunition Warrant Was Supported by Probable Cause*

In this case, it is clear that the officers involved suspected Alderson of drug trafficking. Although, through surveillance, they had succeeded in locating his residence, the police officers investigating Alderson had obviously—and correctly—concluded that they lacked evidence of any nexus between Alderson's residence and his suspected involvement in drug dealing, as would have been required to support a warrant to search his residence for controlled substances and evidence of dealing controlled substances. *See Brown*, 828 F.3d at 383 ("We have never held, however, that a suspect's 'status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.'" (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)). Knowing that, the police officers instead sought, and obtained, a warrant to search for "ammunition or firearm accessories" that could be used by the Glock Model 43X found on Alderson's person when he was arrested on the outstanding arrest warrants, citing Tenn. Code Ann. § 39-17-1307(B) [sic].

Tenn. Code Ann. § 39-17-1307(b)(1)(B) makes it unlawful for a person who has been "convicted of a felony drug offense" to possess a firearm, as that term is defined by Tenn. Code Ann. § 39-11-106. Section 39-11-106(13)(A) defines "firearm" as:

> (i) Any weapon that will or is designed to or may readily be converted to expel a projectile by the action of an explosive;
>
> (ii) The frame or receiver of any such weapon;
>
> (iii) Any firearm muffler or firearm silencer; or
>
> (iv) Any destructive device[.]

Absent from either of these statutes is reference to ammunition, and the only relevant "accessories" covered by the term "firearm" are silencers and mufflers.

In other words, Tennessee law does not make it illegal for a previously convicted felon to own ammunition (or unspecified "accessories"), and the Government has not explained how finding ammunition in the defendant's residence would constitute further "evidence" of the state crime of unlawful possession of a firearm, when the actual firearm was in his possession when he was arrested. Moreover, there is no evidence that any person had ever seen Alderson fire or use a weapon or seen him in possession of a silencer or muffler. The simple fact is that the "crime" identified in the Warrant and Affidavit is not a crime under state law at all. And, even assuming that the Affidavit intended to incorporate reference to silencers or mufflers, the Ammunition Warrant does not provide any probable cause to believe that the defendant was in possession of a silencer or muffler or a reasonable basis for believing he would keep one at his residence.

The Sixth Circuit, however, has also recognized that "[a]n affidavit sufficiently supports a warrant so long as it provides probable cause to believe evidence of *any crime* will be found in the location to be searched, even if it does not provide probable cause to believe that evidence of the particular crimes listed in the affidavit will be found in the location to be searched." *Peffer*, 880 F.3d at 264 n.3 (citing *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991) (holding "that knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants")) (emphasis added). Based on this language, under this unusual circumstance, the court finds that the relevant question is whether the affidavit provides probable cause to believe that ammunition might be found in the defendant's residence in violation of *federal* law, under which it is illegal for a person

previously convicted of a felony to possess "any firearm *or* ammunition" ("in or affecting commerce"). 18 U.S.C. § 922(g).[10]

With regard to that question, the court finds that the supporting Affidavit fails to draw any connection whatsoever between the defendant's residence and the expectation that ammunition would be stored there. *See Brown*, 828 F.3d at 382 (requiring that an affidavit "present sufficient facts demonstrating why the police officer expects to find evidence in the residence rather than in some other place"). Instead, as set forth above, the Affidavit goes into great detail about the traffic stop and the resulting arrest warrants and the basis for the police officers' conclusion that the defendant resided at 1212 Laurel Street, Apartment 1507, but it makes no attempt to explain why Hambrick believed that ammunition would be located at the residence. Just as an individual's "status as a drug dealer, standing alone, [does not give] rise to a fair probability that drugs will be found in his home," *Brown*, 828 F.3d at 383, the fact that an individual is found in possession of a firearm cannot, without more, give rise to an inference that ammunition will be located at his residence. And the Affidavit in this case does not provide more. Detective Hambrick does not allege that Alderson was known to have purchased ammunition or that any witness had seen ammunition in the defendant's residence. Nor had anyone witnessed Alderson fire a gun. Moreover, unlike in cases cited above, the officer seeking the warrant did not attest based on his

---

[10] Neither party addresses this issue or the question of whether, under Tennessee law, state law enforcement officers are empowered to arrest individuals for violation of federal law. In the absence of any argument to the contrary, the court presumes that they are. *Accord Arizona v. United States*, 567 U.S. 387, 438 (2012) (Thomas, J., concurring part and dissenting in part) (noting that "States, as sovereigns, have inherent authority to conduct arrests for violations of federal law, unless and until Congress removes that authority" and citing *United States v. Di Re*, 332 U.S. 581, 589 (1948), for the proposition that state law determines the validity of a warrantless arrest for a violation of federal law "in [the] absence of an applicable federal statute").

knowledge and experience as a police officer that there was a particularized reason to believe that ammunition would be found inside the defendant's house.

As discussed above, "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *Carpenter*, 360 F.3d at 594 (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). "[T]he affidavit must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and *not merely that the owner of the property is suspected of a crime*." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)) (internal quotation marks omitted; emphasis added). The Affidavit in this case does not satisfy this test. On its face, aside from the fact that it failed to identify a violation of state law, it did not provide a "substantial basis for concluding" that there was probable cause to believe that ammunition would be found in Alderson's residence. *Brown*, 828 F.3d at 381 (citations omitted). The Government, in fact, does not even argue that a defendant's possession of a weapon gives rise to a reasonable inference that he will keep ammunition for the weapon at his house, as opposed to keeping it with the weapon itself.

The Ammunition Warrant was not supported by probable cause. Unless some exception applies, the evidence obtained in the course of its execution must be suppressed.

### 3. *The Good Faith Exception*

Of the *Leon* exceptions, only the third is relevant here: whether the warrant was "so lacking in indicia of probable cause" as to render official belief in its existence unreasonable. *Leon*, 468 U.S. at 923. The Sixth Circuit has explained that an affidavit that is

> so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a "bare bones" affidavit. A bare-bones affidavit, in turn, is commonly defined as one that states only suspicions, beliefs, or

conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge. Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts only the affiant's belief that probable cause existed. It provides nothing more than a mere guess that contraband or evidence of a crime would be found [and is] either completely devoid of facts to support the affiant's judgment that probable cause exists, or so vague as to be conclusory or meaningless.

In contrast, an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains a minimally sufficient nexus between the illegal activity and the place to be searched. If the reviewing court is able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been— some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched, then the affidavit is not bare bones and official reliance on it is reasonable.

*White*, 874 F.3d at 496–97 (internal quotation marks and citations omitted). Notably, as the court also explained, a "bare-bones affidavit should not be confused with one that lacks probable cause." *Id.* at 497. "There must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function." *Id.*

The Affidavit at issue in this case qualifies as a "bare-bones affidavit." Although Hambrick goes into some detail regarding law enforcement's previous interaction with Alderson, his status as a three-time convicted drug felon, the fact that he had weapons on him when he was arrested, and the basis for believing that he resided at 1212 Laurel Street, Apartment 1507, it does not provide *any* basis for believing that possession of ammunition was illegal under state law or, even assuming he could petition a state court judge to search for evidence of violation of federal criminal law, that ammunition would be stored in the defendant's residence. For instance, as referenced above, Hambrick does not indicate that the defendant had discharged a firearm or had been known to purchase ammunition, nor does he allege that any informant had been inside Alderson's residence and seen ammunition (or other weapons) stored there. He does not even allege upon information and belief, based on his experience as a law enforcement officer, that an individual

who possesses a firearm is likely to store ammunition in his residence. The police officer's obvious goal was to search Alderson's home for evidence of drug trafficking, but, despite having conducted surveillance, the officers lacked any evidence to connect Alderson's residence with drug-related activity. The *Leon* good-faith exception, under these circumstances, does not apply.

The court further observes that, according to publicly available government statistics, well over 10,000 individuals are arrested each year on federal firearm charges, under 18 U.S.C. § 922 or 924. https://www.justice.gov/usao/page/file/1476856/download (Table 3C, "Criminal Cases in Which a Firearms Offense was Charged under 18 U.S.C. § 922 or 924"). If even a small number of those, like the defendant here, were subject to intrusive home searches simply because they were found to be in possession of a firearm at the time of an arrest, the balance between Fourth Amendment privacy concerns and societal interests in taking criminals off the streets would be shifted substantially in favor of law enforcement, at the expense of the essential privacy of the home that lies at the center of Fourth Amendment concerns. As best the court can ascertain, the Sixth Circuit has never approved a warrant to search for ammunition based simply on the fact that a previously convicted felon was found to be in possession of a firearm, even when the arrest for such takes place outside his home.

### C. The Narcotics Warrant

The true focus of the investigation into Alderson's activities, of course, was his suspected involvement in drug-related activities. Once the police officers executed the Ammunition Warrant—which got them into Alderson's residence and authorized them to search virtually everywhere, since ammunition could be stored virtually anywhere—they also located evidence of drug-related activity. The Ammunition Warrant, that is, provided them with the evidence they needed to seek the Narcotics Warrant. Because the Ammunition Warrant was issued without probable cause and is not saved by the *Leon* good-faith exception, however, all evidence recovered

as a result of the execution of the Narcotics Warrant, too, must be suppressed as "fruit of the poisonous tree."

As discussed above, the rule generally requiring exclusion of evidence seized in violation of the Fourth Amendment is "supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence [that] police derivatively obtain from an unconstitutional search or seizure." *Pearce*, 531 F.3d at 381. To assess whether evidence must be excluded as "fruit of the poisonous tree," a court must consider whether "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon the evidence by the original illegality." *United States v. Crews*, 445 U.S. 463, 471 (1980).

None of the factors identified by the Supreme Court as relevant to this analysis weighs in favor of admitting the evidence obtained in the course of executing the Narcotics Warrant. The temporal proximity is very close, as the procurement and execution of the Narcotics Warrant overlapped with the execution of the Ammunition Warrant. There were no intervening circumstances, and the information used to support the Narcotics Warrant was obtained solely through the execution of the Ammunition Warrant. Moreover, the law enforcement officers' flagrant conduct in gaining access to the defendant's residence through the subterfuge of the Ammunition Warrant, knowing that they lacked any evidence to establish a nexus between his alleged drug-dealing activity and his residence, further weighs in favor of excluding the evidence seized in the course of executing the Narcotics Warrant, all of which was discovered in the course of executing the Ammunition Warrant.

## IV.  CONCLUSION

For the reasons set forth herein, the defendant's Motion to Suppress (Doc. No. 43) will be granted in part and denied in part. More specifically, the evidence discovered and seized during the April 17, 2020 traffic stop (evidence that supports Counts I, II, and III of the Superseding

Indictment) and the evidence discovered and seized during the overlapping searches of the defendant's residence on May 20, 2020 (which supports Counts IV, V, and part of Count VI of the Superseding Indictment) must be suppressed. The Motion to Suppress will be granted with respect to that evidence but denied as to the Glock GMBH, model 43X, 9mm caliber pistol found on the defendant during the search incident to his arrest on the federal arrest warrant and state probation violation warrant on May 20, 2020 and charged as part of Count VI of the Superseding Indictment.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge